## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

Michele White,                          )
                                        )
      Plaintiff,                     )
                                        )
v.                                      )       No. 14 CV 50158
                                        )       Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting               )
Commissioner of Social Security,        )
                                        )
      Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michele[1] White brings this action under 42 U.S.C. § 405(g), appealing the denial

of social security disability benefits. This case is remanded for further analysis because the

Administrative Law Judge ("ALJ") improperly relied almost entirely on one piece of evidence,

which was a weak reed indeed.  Moreover, the ALJ's decision failed to meet basic requirements

of any administrative decision.  Simply put, this Court cannot track the "reasoning" of the

decision.

## BACKGROUND

On February 7, 2011, plaintiff applied for disability insurance benefits. She was then 38

years old. On January 28, 2013, a hearing was held before an ALJ. Plaintiff, represented by

counsel, first testified in response to questions from the ALJ. She testified that she stopped

working in August 2009 because of problems from her left leg and ankle, which had been

bothering her for years, although she kept working during this time:  "I had surgery to – I don't

know even know. Like, they were supposed to take out nerves and correct my foot issues

---

[1] The record occasionally incorrectly refers to plaintiff as "Michelle" White.  Similarly, the record also occasionally incorrectly refers to various other participants in the proceedings, including referring to Dr. Ashok Jilhewar as "Gilhewar."  Those errors have been corrected in this order.

because my foot hurt so bad and that backfired, and complex regional pain syndrome set in and spread up my leg, from my foot up my leg and going down my right leg." R. 13. She stated that her pain made it impossible to stand for any significant amount of time. She could stand "[m]aybe 10, 15 minutes leaning up against something." R. 13. With a cane, she could walk "[a]bout a block and a half, maybe two blocks." R. 14.

Plaintiff testified that, at home, she sits in a rolling desk chair and "scoot[s] around with the broom to sweep [and mop] the floor." R. 16. Although she will sometimes go to the grocery store to get a single item, she goes in to the store and "get[s] right back out." R. 17. Her husband, who works full-time, does the regular grocery shopping. She cannot pick up things, reach over her head, or bend down.

An impartial expert, Dr. Ashok Jilhewar, testified next. He previously worked in internal medicine and gastroenterology. He summarized at some length what he viewed as the key pieces of evidence. *See* R. 19-28. A summary of his testimony follows, which is supplemented in a few places with other evidence in the record:

In 2000, plaintiff stepped in a hole and injured her left ankle. R. 313. Despite ongoing problems from this injury over the years, she continued working. In 2008, her condition worsened. She tried pain injections. When those did not work, she had her first surgery on June 24, 2008. R. 19. After this surgery, she was initially "doing fine" but several months later the pain returned as before. R. 20. Through the fall of 2008 and into 2009, plaintiff continued to experience pain. Tests, such as MRIs and EMGs, confirmed problems with the ankle and related nerves. Pain injections were again tried, but did not work. So, on August 25, 2009, she had a second surgery on her left foot. R. 20. But the pain continued

despite the surgery and, the next year, plaintiff was diagnosed with Complex Regional Pain Syndrome ("CRPS").[2] R. 21.

On November 23, 2010, plaintiff had another surgery, this one to put in a temporary spinal cord stimulator to try and alleviate the pain. On December 14, 2010, there was another surgery to put in additional spinal cord stimulators. These were done because the other measures to relieve pain had not worked. On April 18, 2011, there was yet another operation connected with the spinal cord stimulators. R. 22. A few weeks after this procedure, there were some surgical complications, apparently at the site where an epidural injection was made in plaintiff's spinal cord. R. 23. Complications from the surgery apparently were resolved on May 4, 2011, at least according to a doctor's handwritten notes of the same date. Here is a copy of the relevant part of these notes which is the primary piece of evidence the ALJ relied on:

---

[2] According to the Mayo Clinic website, Complex Regional Pain Syndrome is "an uncommon form of chronic pain that usually affects an arm or a leg" and "develops after an injury." The cause is not clearly understood and treatment is most effective if started early. Sometimes symptoms go away on their own but other times they persist for years. One type is known as "reflex sympathetic dystrophy syndrome." There is not any single test to diagnose the syndrome. One type of therapy is spinal cord stimulation, which involves inserting tiny electrodes in the spinal cord. *See generally http://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/basics/definition/con-20022844.*

**Distribution of Pain**: ☐Left ☐Right ☐Bilateral (specify): _____
**Quality of Pain**: ☐Throbbing ☐Aching ☐Shooting ☐Stabbing ☐Sharp
☐Cramping ☐Burning ☐Other
(specify): _____

**Subjective**: 39 y/o ♀ S/P SCS Revision, Excellent
Coverage, Bandages Removed in Back, C/N/I.
Mild Erythema whole Tegaderm Contacted Skin

**Work Status**: ☐Full time ☐Part time ☐Light Duty ☐Worker's Comp./Disability
☐Retired ☐ N/A

Ø Pus
Ø Fevers
Ø Tenderness

**Physical therapy**: ☐Yes, # of times per week _____  No

R. 23, 688.

On June 7, 2011, Dr. K.P. Ramchandani, the consultative examiner, saw

plaintiff and prepared a report. R. 23; Ex. 21F. He noted that plaintiff had a slow

gait, was lethargic, was not able to walk on heel to toe, and was limping on the

left leg. R. 23. He diagnosed her with Complex Regional Pain Syndrome, among

other things. R. 620. Plaintiff's problems continued as she had yet another surgery

on March 15, 2012.[3]

After Dr. Jilhewar summarized the evidence, the ALJ asked him whether plaintiff "at

some point in time" met a listing. Dr. Jilhewar stated that plaintiff did have a "closed period" of

disability from the onset date (August 25, 2009) until May 4, 2011, when according to Dr.

Jilhewar, plaintiff had "some radiculitis documentation of improvement, 26F, Page 21." R. 25.

(The reference to Exhibit 26F, Page 21 is to the May 4, 2011 note reproduced above.)

---

[3] Although not noted in Dr. Jilhewar's testimony, before the surgery, plaintiff's doctor summarized her
condition as follows: "This is a 39 year old patient with a history of complex regional pain syndrome of
the left lower extremity. [Patient] had failed a multimodal treatment regimen[]." R. 771.

The ALJ then asked plaintiff's counsel what he thought about Dr. Jilhewar's opinion. Counsel seemed surprised by the doctor's conclusion and confused about what was the one piece of evidence cited to establish improvement. Here is the exchange:

ALJ: Okay, before we go further, [counsel], what do you think about his situation of a close[d] period of disability.

ATTY: Well, I don't – her condition, it's – per her testimony has not improved, I mean, since the date that the doctor opined that her period would end. I think her testimony is [that] her condition's actually been worsening, so I don't know what –

ALJ: Okay.

ATTY: The one record that he mentioned regarding improvement, I – if I could get that page number again --

[EXPERT]: Yes, sir, 26F, Page 21.

R. 28.

After the vocational expert testified, the ALJ then offered plaintiff's counsel a chance to ask additional questions. Counsel asked plaintiff further about her pain and how it limits her actions. She testified that she dropped things, had trouble writing, and could not wear any clothes with zippers or buttons. R. 36. When she stands, she has to lean against something and has to use a cane to keep her balance. She has fallen and has trouble going up the stairs, both because her balance is bad and because she had trouble gripping the handrail. She cannot walk on uneven ground. Because of the problems with her feet, she has not worn regular shoes in over a year but instead wears flip-flops. R. 38. Plaintiff testified that she has a lot of problems sitting. Her hips and tailbone hurt, and her legs went numb. She cannot sit in normal fashion with her legs going to the floor, but has to put her feet up in an elevated position. During the day at home, she sits either in a recliner with her feet up on a pillow or on the couch with her feet over the side or on her bed with pillows arranged so that her left foot can hang over without touching anything. She

estimated that she spends 90% of her day with her feet elevated. If she does not elevate her feet, they hurt, turn purple, and swell up. Plaintiff stated that she has "lots" of side-effects from her medications, including dizziness, tiredness, forgetfulness, and excessively dry mouth. R. 40. She has sleep problems caused by her inability to get comfortable. Her physical problems, she testified, have caused an emotional toll and crying fits. R. 41 ("This has taken a lot from my life."). Asked whether she ever thought of killing herself, plaintiff answered: "No, I've never thought that, but I thought of ways to cut my leg off." R. 42. Plaintiff testified that her leg problems had not improved but had "gotten much worse" over time: "It seems like everything we try to do only makes it worse." *Id.*

After eliciting this additional testimony from plaintiff, counsel then asked the vocational expert whether plaintiff could do sedentary work if she needed a cane for standing and walking. The expert said no. R. 43. Counsel asked the vocational expert whether plaintiff could do sedentary work if she needed to frequently elevate her feet. The expert again said no. R. 44.

On February 13, 2013, the ALJ issued his opinion. The ALJ found that plaintiff had the following severe impairments: obesity, a mood disorder, and Complex Regional Pain Syndrome.[4] The ALJ noted that plaintiff was under a disability from August 25, 2009 (the onset date) through May 4, 2011 because she satisfied the requirements of Listing 1.02A, but that she no longer satisfied that listing as of May 5, 2011.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are

---

[4] The ALJ actually used the term reflex sympathetic dystrophy (R. 56), but the ALJ at the hearing confirmed with Dr. Jilhewar that this term is, for purposes of this case, synonymous with Complex Regional Pain Syndrome, which is the term the Court will use for the sake of consistency.

conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014); *Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. Sept. 23, 2014).

In her opening brief, plaintiff raises two arguments directly flowing from these core principles. First, she argues that the ALJ cherry-picked one piece of evidence and ignored most of the other evidence. Second, she argues that the ALJ's credibility analysis was flawed. Both arguments implicate the same fundamental questions this Court must ask when reviewing any Social Security decision. Did the ALJ consider all the evidence, including contrary lines of evidence? *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (an ALJ may not use a "sound-bite" approach in which favorable evidence is cited but unfavorable "related evidence" is ignored). Did the ALJ provide enough explanation to allow this Court to trace the path of his

reasoning? *See Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) ("[the ALJ] was required to provide 'an accurate and logical bridge' between the evidence and his conclusions"). Concluding that the answer to both questions is "no," the Court remands this case.

To assess whether the ALJ improperly cherry-picked the evidence, it will be helpful to first summarize the ALJ's reasoning. The ALJ first concluded that plaintiff's ongoing left leg problems met Listing 1.02A (Major Dysfunction of a Joint) beginning on August 25, 2009, the onset date. Although this conclusion is not being directly challenged here, it logically is linked to the later decision that plaintiff suddenly improved because presumably the same criteria would have been used for both decisions. It is not entirely clear why the ALJ initially concluded that plaintiff met the listing. The ALJ referred to the following pieces of evidence. R. 56. One was a June 22, 2011 Physical RFC Assessment by a nonexamining agency doctor (Dr. Towfig Arjmand) who noted that plaintiff had Complex Regional Pain Syndrome and neuropathy in multiple joints. Another was Dr. Ramchandani's June 7, 2011 report stating that plaintiff had "a gait with a left-sided limp" and "painful dysesthesia, involving the left foot and the lower one half of the left leg." R. 56. Another one was the fact that an MRI and other treatment records from 2010 and 2011 showed that plaintiff had Complex Regional Pain Syndrome. *Id.* The ALJ also noted that Dr. Jilhewar, relying on these same reports, opined that plaintiff met the Listing 1.02A. However, the only discussion of the specific requirements of Listing 1.02A was the conclusory assertion that plaintiff had "ineffective ambulation." R. 57.

After concluding that plaintiff initially met the listing, the ALJ then concluded that plaintiff had "medically improved" as of May 5th (the day after the May 4th doctor visit) and therefore was no longer disabled as of that date. R. 57-58. Here is the ALJ's explanation:

> Dr. Jilhewar further testified that medical improvement is found at Exhibit 26F, page 21 consisting of office treatment records at University Anesthesiologist, based

on examination of the claimant on May 4, 2011. The bandages were removed and the claimant was noted to have no pus, no fevers, and no trembling.

\* \* \*

Dr. Jilhewar testified that she [sic] did not come across any medical source statement, regarding claimant's residual functional capacity. He said that his opinion was that the claimant could perform sedentary exertional work, on and after May 5, 2011. Dr. Jilhewar further stated that the claimant could sit, at one time, for up to eight hours in an eight-hour workday. He noted that the claimant did not need any assistive device.

R. 57. As for legal analysis, the ALJ provided none, other than a citation to 20 CFR § 404.1594(f)(2), which was never discussed or analyzed in any way.[5] The ALJ never referenced the earlier evidence that supported a finding of disability, nor specifically addressed the "ineffective ambulation" requirement of Listing 1.02A.

After reviewing this explanation, the Court finds that plaintiff's core contention—that the ALJ relied heavily (if not exclusively) on the May 4th doctor's note—is correct. Other than this one doctor's note, there is almost no reference to any other evidence in the above discussion. Relying on a single piece of evidence by itself raises doubts about the adequacy of the ALJ's analysis. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Scrogham*, 765 F.3d at 697. This snapshot approach is also contrary to Section 404.1594, which the ALJ cited to but did not actually consider or apply. The regulation instructs ALJs to consider the possibility that a patient's apparent improvement is really only temporary:

In some cases the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, we will be careful to consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsenings. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.

20 C.F.R. § 404.1594(c)(3)(iv).

---

[5] This section is titled: "How we will determine whether your disability continues or ends."

The ALJ here failed to consider plaintiff's longitudinal history—more specifically her "prior remissions" and "future worsenings." The pre-May 4th evidence shows that plaintiff had a history of temporary improvement followed by relapses. For example, as Dr. Jilhewar testified, after plaintiff's first surgery in June 2008, she was "doing fine" initially but then the "pain recurred" several months later. R. 20. Dr. Timothy Lubenow, one of plaintiff's treating doctors, noted that after plaintiff was treated with an epidural, she had "some improvement" in the first week and a half but this was followed by "worsening of the pain back towards her baseline." R. 415.

But the ALJ did not even need to rely on this earlier evidence to try to predict whether plaintiff's problems were temporary or permanent. The hearing took place on January 28, 2013. So the ALJ had about 20 months of actual evidence bearing directly on this issue. At the hearing, both plaintiff and her counsel objected to Dr. Jilhewar's theory that plaintiff had improved and stated that her problems had worsened. Plaintiff then offered additional detailed testimony about her current problems, stating for example that she had worn flip-flops for a year because of the sensitivity and pain in her feet, that she has to elevate her legs 90% of the day, that she has to use a cane even while standing, that she has fallen many times, that she sleeps fitfully because of the pain, and that she takes multiple medications which cause various side-effects. The ALJ never even acknowledged this testimony.

Nor did the ALJ consider the medical evidence after May 4th. Dr. Jilhewar noted that plaintiff continued to have problems and that she had yet another surgery on March 15, 2012— 10 months after the date of the alleged improvement. R. 23. That she needed another surgery is a fact that the ALJ, at a minimum, should have considered and explained. Moreover, as noted above, the ALJ initially found that plaintiff was disabled up until May 4th based on two reports

from agency doctors. One was Dr. Ramchandani's June 7, 2011 report and the other was Dr. Arjmand's June 22, 2011 report. Yet, both reports were issued a *month* after plaintiff had supposedly improved. Moreover, both doctors concluded that plaintiff had Complex Regional Pain Syndrome and that she was continuing to experience significant pain, and neither doctor gave any indication that they believed plaintiff had recently had a dramatic improvement. Here again, these facts, seemingly contrary to the ALJ's conclusion, cry out for analysis.

The problem is not merely that the ALJ relied on one piece of evidence or that he ignored most of the other evidence. The problem is also that the one piece of evidence is equivocal on many levels. As a preliminary point, as plaintiff notes in her opening brief, this piece of evidence consists of "sparse, almost unintelligible, handwritten notes." The ALJ relied on only one observation from this note. The ALJ observed that, after the doctor removed the bandages, he noted that there was "no pus, no fevers, and no trembling." R. 57. This appears to be a very limited observation related only to the healing of the surgical site on plaintiff's spine where the epidural was implanted. Insofar as this Court can tell, it had no connection to plaintiff's ongoing left leg symptoms. Fever and pus were not the problems plaintiff had been complaining about for many years; they were merely a secondary and temporary issue related to the surgery itself.

It is also worth noting that the doctor who authored the May 4th note did not make any larger diagnosis about plaintiff's leg problem. There is no statement from this doctor (or any other doctor aside from Dr. Jilhewar, a gastroenterologist) that plaintiff's Complex Residual Pain Syndrome had been cured or even had improved. As indicated by its name and as confirmed by the Mayo Clinic website, the condition is complex and difficult to diagnose; plaintiff had symptoms for several years before being diagnosed; and the diagnosis was made only after many doctor visits and several surgeries and other measures were tried and failed. What is missing then

is any larger explanation as to why, after many years of failed therapeutic interventions, this one was working. Reading the ALJ's opinion it appears that—suddenly, almost magically—plaintiff's medical problems improved on a single day. In sum, this singular piece of evidence is not powerful enough on its own to show that plaintiff was no longer disabled. If an ALJ chooses to rely almost exclusively on one piece of evidence, then the ALJ should ensure that the evidence is strong enough to support that reliance.

In its response brief, the Government offers counter-evidence designed to rebut plaintiff's claim that she did not improve as of May 4th, although the Government even then still concedes that plaintiff continued to be in chronic pain after May 4th. *See* Resp. Br. at 5 (citing R. 771, 692, 694). For example, the Government points to one observation that plaintiff's Complex Regional Pain Syndrome symptoms "were decently controlled except for 2 spots on her left foot." *Id.* But these arguments are after-the-fact explanations that were not relied on by the ALJ. Therefore, they cannot be considered now by this Court. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced").[6] Therefore, rather than bolstering the ALJ's decision, they undermine it by reinforcing plaintiff's main argument, which is that the ALJ overlooked a swath of evidence.

One further point. Although not challenged now by plaintiff, the Court notes that plaintiff testified to having emotional problems arising out of her years-long struggle to find relief from

---

[6] The Court recognizes that the Seventh Circuit has threatened sanctions against agency counsel for violating *Chenery*. *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014). But the Court also recognizes that agency counsel can have a difficult task attempting to salvage less than stellar administrative decisions, like the one in this case. To paraphrase Francis D. Morrissey (one of the greatest Illinois appellate lawyers of all time), some decisions are difficult to shine. The Court wonders if the administration's resources would be better spent hiring the agency counsel to be ALJs. That way the repeated ALJ errors the agency counsel attempt to correct on appeal can be prevented in the first place. Of course, the allocation of resources is a political decision for the elected branches. The Court is simply sharing its views from its perspective.

her leg problems and pain. On May 31, 2011, she underwent a mental health examination. Dr. Kelly Renzi diagnosed plaintiff with major depressive disorder. R. 615. But the ALJ never mentioned these facts in the opinion. The ALJ conducted an analysis of whether plaintiff met listing Section 12.04 (affective disorders). But the analysis is entirely devoid of any specific facts relating to plaintiff. It is not even clear what the ALJ believed the affective disorder was, although it would presumably be depression. As part of this analysis, the ALJ assessed plaintiff's daily activities. But the ALJ, following the same larger pattern discussed above, included *no* facts. Here is the ALJ's *entire* analysis: "In activities of daily living, beginning May 5, 2011, the claimant has mild restriction." R. 58. As described in the fact section above, plaintiff testified to limitations of various sorts. The ALJ should have at least acknowledged these facts in some way.

In sum, the Court finds that a remand is warranted for the basic reasons that the ALJ failed to consider significant lines of evidence and failed to build a "logical bridge" to enable this Court to trace the path of his reasoning. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

## CONCLUSION

Plaintiff's motion for summary judgment is granted; the government's motion is denied; and the decision of the ALJ is remanded for further consideration.

Date: March 16, 2016          By: _____
                                   Iain D. Johnston
                                   United States Magistrate Judge

13